UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 11-CR-017 |
| | ) | Honorable Thomas J. McAvoy |
| RICHARD ULLOA | ) | U.S. District Judge |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Richard Ulloa stands before this court for sentencing following his conviction after trial

of seven counts of Mail Fraud in violation of 18 U.S.C. §§ 1341; 1349 & 2.  On December 30,

2010, after a three day trial, at which Mr. Ulloa represented himself, a jury convicted him of all

seven counts in the indictment.  Mr. Ulloa continued representing himself throughout the post

conviction process.  On July 12, 2011, Mr. Ulloa was scheduled for sentencing.  Mr. Ulloa

appeared at sentencing and ultimately asked the court to appoint the Office of the Federal Public

Defender to represent him.   Counsel urged the court to order an evaluation of Mr. Ulloa before

pronouncing sentence.  Based on Mr. Ulloa's conduct before, during and after the trial, defense

counsel believed an evaluation was appropriate.

Pursuant to pursuant to 18 U.S.C. § 4241(b) the court, concerned by Mr. Ulloa's conduct

during and after the trial, ordered an evaluation.   Mr. Ulloa was sent to Devens Correctional

Institution in Ayer, Massachusetts.  He was evaluated, and ultimately returned to the Northern

District of New York on Tuesday, December 6, 2011.  The forensic report that was generated as

a result of the evaluation was provided to counsel on November 30, 2011 via email.

A review of Mr. Ulloa's filings since his conviction, in response to the pre sentence

1

report, reveal Mr. Ulloa has objected to many aspects of the pre sentence report.  Counsel is not

replacing or nullifying any of those objections by this memorandum.  Specifically, this

memorandum is provided to expand upon Mr. Ulloa's objection to the loss calculation adopted

by the pre sentence report.

By the time the court reads this memorandum, the court will be versed in Mr. Ulloa's

history and characteristics.  Mr. Ulloa testified at his trial, he provided information to the

probation department which is included in the PSR, he participated in the evaluation done by Dr.

Shawn E. Channell, Ph.D. and with this memorandum has provided many letters from friends

and family attesting to his character and reputation in his community.    Counsel, in drawing the

conclusions set out below, will draw on many of these facts.  At the time of sentencing, the

defense will as the court for a sentence within the guideline range of 21 to 27 months.  Such a

term of incarceration is reached by using the base offense level of seven (7), adding six (6) levels

based on a loss amount between 30,000 and 70,000, and adding three (3)  levels pursuant to

U.S.S.G. § 3A1.2(a) (government employee victim).  At an offense level of 16, in the criminal

history category of 1 the advisory range is 21 - 27 months of incarceration.  As argued below,

any loss amount greater than the range suggested above is not supported by the record and will

require a hearing in order to afford the government an opportunity to prove an amount greater

than 70, 000.00 and to afford the defense an opportunity to contest any such amount. In addition,

such a sentence takes into account Mr. Ulloa's diminished mental capacity.

MR. ULLOA'S DIMINISHED MENTAL CAPACITY

The Court has received and reviewed the Forensic Evaluation submitted by Dr. Shawn Channell

Forensic Psychologist with the Bureau of Prisons facility in Ayers, MA.  Dr. Channell does an

extensive evaluation of Mr. Ulloa and finds him competent to be sentenced.  Dr. Channell's

conclusions were contrary to two prior evaluations, one conducted by Dr. Gerald Fix and one written by Dr. Catherine DiNardo.  Both the Fix and DiNardo reports concluded Mr. Ulloa suffered from delusional disorder and as such was not competent to stand trial.  Dr. Channell relies on the inclusion of "sovereign citizen" movement as a subculture in refusing to diagnose delusional disorder in Mr. Ulloa.  Obviously, Dr. Channell's inclusion of "sovereign citizen" group as a subculture is not universally agreed on by members of his profession.  (See Dr. Fix and Dr. DiNardo's contrary conclusions).  Regardless of his conclusions Dr. Channell's report does point out some relevant personality disorders which should be considered by the court.

According to Dr. Channell, "Personality disorder is a longstanding, maladaptive pattern of traits and behaviors which causes significant distress or impairment in social, occupational, or other important areas of functioning.  Mr. Ulloa is diagnosed as suffering from Narcissistic personality disorder.  This illness has contributed to Mr. Ulloa's actions in the present case.

Unfortunately, it does not appear that Dr. Channell spoke to any of the people who know Mr. Ulloa best.  His family and friends have submitted letters on his behalf.  Many of his close friends and family mention a change in him dating back five or six years.  Those letters, along with the two prior evaluations support the idea that he was suffering from a mental disease that clearly contributed to his conduct in this case.  The court is going to decide if Mr. Ulloa is fit to be sentenced.  The defense relies on the two prior reports from Dr. Fix and Dr. DiNardo, (previously provided to the court at the initial sentencing) as well as the letters from Mr. Ulloa's family and friends and the record of Mr. Ulloa's conduct before the court.  The defense urges the court to find Mr. Ulloa not competent to be sentenced and to order Mr. Ulloa to receive treatment in an effort to rehabilitate him.

CALCULATING THE LOSS

The main sentencing issue in the case is the calculation of the loss amount.  The defendant's

position is that an amount between $30,000.00 and $70,000.00 is established in the record, but

no more.  The arbitrary numbers on the fraudulent notices of lien do not accurately reflect the

loss the defendant intended to inflict by his conduct and thus are not properly calculated as

'intended loss" in the PSR.

"The guidelines define loss as the greater of actual loss or intended loss." U.S.S.G. §

2B1.1, comment. (n.3(A)).  "Actual loss" is the "reasonably foreseeable pecuniary harm that

resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)).  "Intended loss" is "the

pecuniary harm," i.e., harm that is "monetary" or "readily measurable in money," that was

intended to result from the offense. U.S.S.G. § 2B1.1, comment. (n.3(A)).  "A defendant is

presumed to intend the natural and probable consequence of his acts."  United States v. Jacobs,

117 F.3d 82, 95 (2d Cir. 1997).

In, United States v. Joetzki, 952 F.2d 1090 (9th Cir.1991) the court held that the

government had the burden of showing that the defendant "attempted to inflict the loss." Id. at

1096.  Presumably the same showing would be required of the government in the present case.

In order to support the loss calculation in the PSR, the government will have to establish by a

preponderance of the evidence that the defendant intended to cause a multi-trillion dollar loss.

Nonetheless, "[b]efore the district court may enhance a defendant's sentence based upon intended

loss, there must be evidence sufficient to show that (1) the defendant intended the loss, (2) the

defendant had the ability to inflict the loss, and (3) the defendant completed all acts necessary to

cause the loss." United States v. Fleming, 128 F.3d 285, 287 (6th Cir. 1997). "[T]he crucial

question for determining intended loss for sentencing purposes is the loss that the defendant

actually intended to cause." United States v. Wells, 127 F.3d 739, 746-47 (8th Cir. 1997) (defendants did not actually intend to cause any loss, and therefore proper to use actual loss amount even though possible loss was much greater).

The Second Circuit and others have held that the intended loss must bear some relationship to economic reality. See, United States v. Dutsch, 987 F.2d 878,886 (2d Cir. 1993) (error to simply total face value of bogus checks that were used in a credit card fraud, where each check partially replaced previous ones so that the actual or intended amount of fraud was much less); United States v. Dozie, 27 F.3d 95, 99 (4th Cir. 1994) (proper to "discount" false insurance claims to estimate realistic probable loss - "insurance claims are frequently inflated. Basing the probable loss on the claim, then, does not reflect economic reality"); United States v. Santiago, 977 F.2d 517, 514-26 (10th Cir. 1992) (loss in unsuccessful insurance fraud could not exceed sum that insurance company would have paid, even though defendant filed much larger fraudulent claim: "whatever a defendant's subjective belief, an intended loss under Guideline Section 2F1.1 cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful"); United States v. Khan, 969 F.2d 218, 220 (67th Cir. 1992) (improper to increase offense level by estimated loss when completed fraud could not have resulted in actual loss).

The notices of lien in this case could not have resulted in the actual loss of the amounts stated in the lien.  No witness or evidence was presented to establish that there was even a remote possibility that any actual payments on any notice of lien was or could have been made.

No one credibly believed that Mr. Ulloa was attempting to actually obtain any of the funds that were the subject of the notices of liens. Rather, it was the means by which Mr. Ulloa was attempting to challenge the actions of the credit union, the judge and the police by getting

them to the table to redress the wrongs he perceived they perpetrated upon him.   Regardless of

whether such means were wrong or based on an erroneous belief in the law, it was not Mr.

Ulloa's intent to obtain the arbitrary monetary amounts in the notices of liens.  It was his intent to

"bring the parties who 'injured him' to the table."   Any claim that the intended loss was the face

value of the liens is at most on pure speculation and contrary to any evidence or testimony

presented.   "Such speculation is not permissible under the Guidelines." United States v. Dutsch,

987 F.2d at 886.   Further, no evidence has been presented to establish that, *even if not*

*fraudulent*, a properly filed "notice of lien" could result in the payment of any monies without

taking additional steps.  No such steps were proven aken in this case.  Given the foregoing, Mr.

Ulloa's offense level should not be increased by the amount of loss calculated in the PSR.  At

most, the costs associated with clogging the system and inconveniencing the victims are the

<u>intended</u> or <u>probable</u> losses inflicted by Mr. Ulloa's conduct.

    During the trial the government made clear, through the evidence it submitted and the

witnesses it called, that the intended result of Mr. Ulloa's conduct was not the payment of the

arbitrary face values included on the notices of lien.  Rather, the government argued that the

intended loss and the probable result of Mr. Ulloa's conduct were the costs associated with

dealing with the liens, whether by generating a need to retain counsel, by creating man hours of

County employees, or by necessitating a credit monitoring service.  Targets of Mr. Ulloa's

conduct never paid, or reasonably expected to pay any amount on the notices of lien.  Nothing,

other than speculation was offered on potential claims of damage to credit ratings and no

monetary amount has been attributed to any such loss.

    The response to the notices of lien cost various amounts of money to the targeted victims.

In testimony, the County claimed approximately $7,600.00 in hours spent by employees diverted

from other tasks, the credit union claimed approximately $60,000.00 in legal fees, the officer

testified to buying a credit protection service for $120.00 a month for an unknown period of

time.  The total of the intended loss, the loss associated with "clogging up the system", and

"bringing people to the table" to right the wrongs perceived by Mr. Ulloa were far less than the

arbitrary numbers attached to the notice of lien documents relied on by the probation department.

The record supports a loss amount between 30,000.00 and 70,000.00 dollars.

At various points throughout the trial the government represented Mr. Ulloa's intent as one of

clogging the system and frustrating the targets into acting in way satisfactory to Mr. Ulloa.  In its

closing, the government summed up its position on the intended loss, many times in many ways.

All involved the intended loss as clogging the system and "bringing people to the table."

> *"This case is about retaliation, it's about someone who uses legal process to, in his own words, bring people to the table" Transcript P. 139, L. 17-19*

> *"It's the selective use or the selective recognition of the law, ladies and gentlemen. When it suits him, he follows it.  When it doesn't suit him, he brings them back to the table." P. 140, L. 16-19*

> *". . . somebody who is acting opportunistically, someone who says I have to get my property back, I am gonna coerce them, I am gonna bring them to the table." P. 143, L. 22-24*

> *"And so what he does is he creates litigation, he creates costs to the bank.  He creates a variety of problems, including problems with regulators.  And what does he do?  Maybe, maybe they'll yield, maybe they'll make a business decision.  This is too much work, this too expensive, we are gonna give him back his property, we are gonna negotiate a settlement. " P. 143, 144, L. 25, 1-9*

Mr. Ulloa's intended harm was the clogging of the system creating litigation, in an

attempt to get others to yield to his position.  No testimony or evidence has been presented to

establish an attempt to recover any monies listed in the notices of lien by Mr. Ulloa.  The court

asked for an estimate of the guideline calculation before it released the defendant post

conviction.  The government and the defense agreed the loss was in the neighborhood of

70,000.00.  Transcript P. 226-227  This calculation was based on the testimony and evidence

elicited at the trial that had just been completed.  Calculating loss on the arbitrary figures placed

in the notices of lien leads to ridiculous results.  The guidelines cannot be stretched and

disfigured to such an extent as to rank Mr. Ulloa's case as one of the largest frauds of our time.

Mr. Ulloa's intent was made clear from the conduct presented in trial.

Any reliance on United States v. Speight, 75 Fed.Appx. 802 C.A.2 (N.Y.), 2003 to

support the loss calculation on the arbitrary numbers in the notices of lien is misplaced.  In

Speight the defendant took the added step of trying to blackmail the victims into paying to have

the liens withdrawn.  Not merely causing litigation, but blackmail.  Speight gave increased

weight to the figures in the notice of liens because of his conduct.  The loss calculation was

never challenged at the District Court level, and as such, the Second circuit was required to find

plain error.  It did not, but concluded any "hypothetical error" (in the loss calculation) would be

outweighed by the District Court Judges departure.  The Speight decision cannot be used to

endorse the use of the arbitrary numbers in the notices of lien in this case as the basis of the loss

calculation.

The evidence presented at trial, and the record before the court fails to establish that Mr.

Ulloa ever intended to collect any money from the victims in this case.   His intended loss was

the costs of litigation.  Testimony offered at the trial establishes a loss by the targets attributed to

Mr. Ulloa's intent and probable results of his conduct at between $30,000.00 and $70,000.00.

This range results in the addition of six (6) levels to the base offense level of seven (7).

CONCLUSION

A hearing is required if the court intends to find a loss amount greater than the loss intended and created by the defendants conduct.  Mr. Ulloa's intent was to create litigation, clog the system and coerce people to his view of the law.  The probable result of such conduct is to create billable hours, cause the expenditure of man hours and inflict the costs associated with dealing with the various filings and taking other reasonable steps taken to protect ones credit. The arbitrary, outrageous numbers used in the fraudulent notices of lien are of no value in establishing a loss amount and cannot form the basis for calculating loss. The record is insufficient to support the use of these arbitrary numbers. A sentence at or below the guideline level 16 renders a sufficient but not greater than necessary sentence in this case.

Dated: December 9, 2011                          LISA PEEBLES
                                                 Federal Public Defender


                                      By:   _/s/ Paul Evangelista___
                                            Paul J. Evangelista, Esq.
                                            Assistant Public Defender
                                            Bar No.: 507507
                                            39 North Pearl St., 5th Floor
                                            Albany, NY 12207


**CERTIFICATE OF SERVICE**
       On today's date the above sentence memorandum was filed with the court and delivered via cm/ecf to the following parties: Thomas A. Capezza, Esq. and Charles Bell, SUSPO.

December 9, 2011                                 */s/ Paul Evangelista*
                                                 Paul J. Evangelista, Esq.

                                                 Assistant Public Defender

9